IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-CR-83-PLR-HBG-3 |
| | ) | |
| JASON L. HOWARD, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter is before the Court upon Defendant Jason Howard's Motion to Suppress and Memorandum in Support [Doc. 13], filed on June 26, 2019. The Government filed a response in opposition to the motion [Doc. 24] on July 3, 2019.

An evidentiary hearing was held on Defendant's pending motions, including Defendant's Motion to Suppress, on August 29, 2019. [Doc. 28]. Assistant United States Attorney Kevin Quencer appeared on behalf of the Government. Attorney Gerald L. Gulley, Jr., represented Defendant Howard, who was also present. After hearing the arguments of counsel, the Court took the motions under advisement.

Accordingly, after reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that the Defendant's Motion to Suppress [Doc. 13] be denied.

# I. POSITIONS OF THE PARTIES

This case arises out of the February 26, 2019 stop of Defendant's Dodge Charger by the Tennessee Highway Patrol ("THP") on Highway 68, as Defendant was traveling from Ringgold, Georgia to his home in Cumberland County, Tennessee.

Defendant Howard is charged [Doc. 1] with knowingly and intentionally possessing with intent to distribute fifty grams or more of methamphetamine, a Schedule II controlled substance (Count 1), as well as knowingly possessing a firearm in furtherance of a drug trafficking crime (Count 2).

Defendant seeks [Doc. 13] to suppress and exclude all evidence seized as a result of the February 26, 2019 traffic stop, claiming that the stop and subsequent search of his vehicle violated his rights under the Fourth Amendment. Defendant contends that the officers lacked probable cause to conduct a warrantless search of his vehicle. First, Defendant asserts that the THP troopers lacked probable cause to stop his vehicle. Additionally, Defendant maintains that "to the extent that the Government may argue that the officer's actions were justified as a stop based on investigative procedures," the officers unconstitutionally deployed and directed a K-9 unit to "hit" on Defendant's vehicle. [*Id.* at 3–4].

The Government responds [Doc. 24] that the search of Defendant's vehicle was lawful and properly conducted. The Government contends that the initial stop was lawfully based on the vehicle speeding. After the initial stop, the Government asserts that the THP troopers developed an independent, reasonable suspicion of drug activity when Defendant lied to the officers about where he was coming from, in contrast to their previously obtained information; Defendant's failure to make eye contact with Trooper Cothron and instead focusing on the passenger's interaction with law enforcement; Defendant's failure to directly respond to Trooper Cothron's

2

question about whether there were drugs in the car; and the passenger's actions when asked about a small amount of marijuana that appeared to be on the floor of the vehicle. Moreover, the Government alleges that under the collective knowledge doctrine, the THP troopers' knowledge that law enforcement officers from Homeland Security Investigations ("HSI") and the Tennessee Bureau of Investigation ("TBI") were conducting a drug investigation, believed that the stopped vehicle contained methamphetamine, and requested that the THP search the vehicle, constituted a reasonable suspicion of drug activity. Lastly, the Government asserts that the K-9 sniff in the present case established probable cause for law enforcement to search the vehicle, and "the drug detection dog was not instructed or forced to alert on the car." [*Id.* at 6].

## II. SUMMARY OF TESTIMONY

At the August 29 hearing, the Government presented the testimony of TBI Special Agent Brently White ("White") and THP Trooper Adam Cothron ("Cothron"). Defendant presented no witnesses. The Government introduced as Exhibit 1 a May 31, 2018 narcotics certification from the United States Police Canine Association for Trooper Cothron's partner, Trooper Doug Foster ("Foster"), and his K-9, Anya. Additionally, the Government introduced as Exhibit 2 a certification that Trooper Foster and his K-9 had completed the "2017 Basic Narcotic Detector Handlers Training" through the Tennessee Department of Safety Training Center. Exhibit 3 was a dash cam video from Trooper Cothron's vehicle during the traffic stop on February 26, 2019. Defendant introduced as Exhibit 4 a handwritten diagram from Special Agent White during the hearing. The Court summarizes the witnesses' testimony and exhibits as follows.

The Government first presented the testimony of Special Agent White, who stated that he has worked for the TBI for approximately two and a half years. Special Agent White stated that in February of 2019, TBI partnered with HSI in order to investigate a drug trafficking organization

out of the Northern District of Georgia. Special Agent White testified that law enforcement began investigating a suspected drug trafficker named Roy Headrick ("Headrick"), and obtained a wiretap on Headrick's phone. During the course of the investigation, confidential sources had provided information that they had purchased methamphetamine from Headrick, and that he obtained methamphetamine from the Atlanta, Georgia area. Special Agent White stated that shortly after midnight on February 26, 2019, an intercepted call revealed Headrick asking Defendant whether he was "going down tomorrow," which Special Agent White interpreted to mean that Defendant was likely picking up methamphetamine. Special Agent White testified that Defendant then responded that he had "been down" that day, and was unsuccessful, but that he would be going down to the Atlanta area again early that day.

Special Agent White detailed that later on February 26th, TBI and HSI officers surveilled Headrick leaving his residence in Tennessee and followed him to Atlanta, Georgia. When monitoring calls over Headrick's phone, law enforcement intercepted calls between Headrick and a Hispanic male, Rojelio Barajas ("Barajas"), who frequently had conversations with Headrick regarding large amounts of money. Special Agent White testified that law enforcement witnessed Headrick meet with Barajas several times prior to February 26, 2019, and believed the interactions to be typical of conducting drug transactions. Upon arrival to Atlanta, Special Agent White testified that Headrick allegedly met his supplier of methamphetamine for a believed "money drop," and was directed across the street to meet with an associate of the supplier. TBI and HSI officers then witnessed Headrick exchange a bag, leave that location, and head north on I-75 towards Tennessee.

Special Agent White testified that he maintained surveillance, and during this period, the investigation intercepted a phone call between Headrick and an individual later discovered to be

the Defendant, in which Headrick stated that he needed gas money and planned to meet at a gas station in Ringgold, Georgia. Law enforcement witnessed Headrick drive into the gas station and begin pumping gas into his vehicle. Special Agent White stated that he then witnessed the Defendant drive next to Headrick's vehicle, and Headrick and Defendant greeted each other and began to look inside the trunk of Defendant's vehicle. Special Agent White testified that he was suspicious because Defendant and Headrick had previously spoken about Headrick's need for gas money, but Headrick had already pumped gas. Further, Special Agent White referenced Headrick alluding to Defendant that he could "hook you up," which Special Agent White interpreted to mean that he could "hook up" Defendant with Headrick's drug supplier in Atlanta. Headrick and Defendant then left in different intervals from the gas station, but reconnected on the interstate, as they stayed on I-75, traveling northbound towards Knoxville. TBI and HSI officers continued surveillance, and Special Agent White stated that both Headrick and Defendant were driving at a high rate of speed, between 90 to 100 miles per hour. Additionally, Special Agent White testified that TBI and HSI officers intercepted a conversation between Headrick and Defendant's girlfriend, who was present in Defendant's car, in which Headrick discussed how fast the vehicles were driving, and Defendant's girlfriend stated that she had an application on her phone to avoid law-enforcement detection.

Special Agent White detailed that the vehicles continued driving northbound on I-75 until Exit 62, and TBI and HSI officers intercepted a phone call between Headrick and the Defendant, in which Headrick stated that he was going to deliver something in someone's mailbox. Special Agent White testified that at this point, he believed that Headrick was dropping off methamphetamine, and law enforcement split their surveillance efforts between Defendant and Headrick. However, law enforcement shortly lost surveillance on both individuals. Special Agent

White testified that the investigation believed that both Defendant and Headrick were returning home, so agents were stationed around Spring City, Tennessee—the route that Headrick typically took to return home from Atlanta, Georgia. Special Agent White stated that approximately ten minutes later, a surveillance unit in Spring City radioed that he had located Defendant's Dodge Charger. After coordinating with the THP to make a traffic stop if necessary, TBI and HSI officers followed Defendant from around Spring City into Cumberland County. Special Agent White testified that two THP troopers were located in Cumberland County, and he then passed off surveillance of Defendant's vehicle to the THP.

Special Agent White stated that he communicated to THP officials that the TBI and HSI had obtained a Title III wiretap on a drug trafficking organization, and a vehicle was travelling from Atlanta, Georgia that they suspected contained methamphetamine based upon the earlier events and intercepted phone calls. Special Agent White further testified that the investigation relayed to the THP that they wished for a traffic stop to be made on the Dodge Charger based upon the THP troopers' reasonable suspicion and any probable cause to search the vehicle. Additionally, Special Agent White stated that he utilized the state highway patrol officers because of their use of a marked law enforcement vehicle, as well as the ability to use highly-trained interdiction officers.

On cross-examination, Special Agent White testified that the TBI and HSI had a Title III wiretap to intercept calls from Headrick, and on or about February 26, 2019, he intercepted a telephone conversation between Headrick and an individual he later learned to be the Defendant. Special Agent White stated that the context of the conversation led him to believe that Defendant was planning something illegal with Headrick, as Defendant indicated that he had been "down there" earlier and was unsuccessful. However, Special Agent White stated that he was unsure if

6

Defendant called Headrick, but that there were multiple telephone conversations between them. Additionally, Special Agent White detailed that he believed Headrick told Defendant that he had used all of his money based upon the believed transaction in Atlanta, and discussed the use of gas money. Special Agent White clarified that the investigation was unsure about Headrick's need for fuel, but was suspicious that Headrick stated that he needed gas money but then proceeded to start to pump gas.

Special Agent White testified that around five to seven separate surveillance vehicles maintained surveillance on Headrick in Ringgold, Georgia, with two separate vantage points, and some surveillance vehicles arriving to the gas station before Headrick. However, the closest surveillance vehicle was across the street from the gas station where Headrick was, which Special Agent White estimated to be around 100 yards. Special Agent White stated that there were not many businesses off of the exit where Headrick stopped, and he relied upon the information he received from surveillance units that reached the exit before Headrick. Further, Special Agent White testified that he did not believe there was any video of the surveillance of Defendant and Headrick meeting in Ringgold, Georgia. Special Agent White stated that he was unsure if the law enforcement officers utilized binoculars, although it is common practice. Special Agent White also testified that TBI and HSI officers witnessed Headrick pull up to a pump, go into the gas station, exit the gas station, and begin pumping gas. However, Special Agent White stated that he was unsure of the interval of time between Headrick entering the gas station and beginning to pump gas, and that law enforcement was unable to see Headrick inside the gas station.

After Headrick finished pumping gas, Special Agent White detailed that he waited until Defendant drove up next to Headrick's vehicle. Special Agent White testified that he was unsure if Defendant pulled up next to a pump at the gas station, as his vantage point was on the other side

of a bridge, positioned to pick up surveillance when Headrick and the Defendant re-entered onto the interstate. Special Agent White stated that he believed that Defendant and Headrick spoke for approximately ten minutes. Further, when reviewing Headrick and Defendant's earlier conversation that Headrick could "hook up" Defendant, Special Agent White clarified that based upon the surveillance of Headrick, he believed that Defendant expressed displeasure with an acquaintance in Georgia, and Headrick offered to introduce Defendant to his source of supply in Atlanta. After being questioned regarding whether the term "hook up" could refer to a sexual liaison, Special Agent White stated that he believed the term to reference an introduction to buy drugs, due to its common usage in drug trafficking and the background of the information obtained from the wiretap.

Special Agent White testified that no TBI and HSI officers witnessed Headrick and Defendant conduct an exchange, but that Headrick pulled next to a pump, with the front of his vehicle facing the highway. However, the rear of Defendant's vehicle was facing the highway, in the opposite direction, resulting in Defendant and Headrick's backs facing the surveillance unit when standing in front of the open trunk of Defendant's vehicle. Special Agent White subsequently diagrammed the location of Defendant and Headrick's vehicles, which Defendant introduced as Exhibit 4. Special Agent White again clarified that based upon the vantage point of the surveillance officers, they were unable to see whether Defendant or Headrick reached into the truck, but based upon the context of the meeting, and previous information received connecting Headrick with drug trafficking, he believed that the meeting appeared highly suspicious.

Next, Special Agent White detailed that Defendant's vehicle began to pull onto the entrance ramp heading northbound on I-75. Special Agent White stated that he was unsure whether Defendant or Headrick's vehicle left first, and Defendant's vehicle had very dark tinted windows,

8

resulting in TBI and HSI officers being unable to see inside the vehicle or verify the identity of the driver. However, based upon Defendant's previous intercepted phone conversations with Headrick, Special Agent White testified that law enforcement also knew that a female and a young child were inside of the vehicle. Special Agent White stated that he had never observed Defendant in any other surveillance related to drug trafficking.

Special Agent White detailed that he entered onto I-75 heading northbound at this time, with TBI and HSI surveillance units both ahead of and behind Defendant and Headrick's vehicles. Special Agent White testified that both vehicles were traveling well above the speed limit and exceeding the flow of traffic. Further, Special Agent White stated that after both vehicles exited at Exit 65, near Sweetwater, he followed Headrick's vehicle, while Defendant's vehicle separated, heading west towards Cumberland County. After he was unable to continue to follow Headrick's vehicle, Special Agent White testified that he notified the THP to engage in attempting to surveil Defendant and Headrick. However, Special Agent White stated that TBI and HSI officers had been in contact with THP officials since Defendant and Headrick entered Tennessee. Special Agent White stated that he drove by Defendant's vehicle after it had been stopped, but that he was not present for the stop. Special Agent White testified that it was subsequently relayed that methamphetamine and a loaded handgun were found within the vehicle.

On re-direct examination, Special Agent White stated that he informed the THP that they had a wiretap on Headrick, Headrick had met with the driver of the Dodge Charger and TBI and HSI officers observed suspicious activity, the Dodge Charger was a vehicle of interest related to the wiretap, and that he wished for the THP to stop the vehicle if they observed separate reasonable suspicion of criminal activity and probable cause to search the vehicle. Special Agent White informed the THP that the vehicle may contain methamphetamine due to the nature of the

9

investigation. Special Agent White testified that confidential sources had told TBI and HSI officers that Headrick was dealing large amounts of methamphetamine, and Headrick was then seen meeting with his supplier, with whom he had been communicating with regarding drug transactions. Special Agent White stated that the investigation believed Defendant's contact with Headrick was suspicious because immediately following Headrick's meeting with his drug supplier, he communicated with Defendant regarding their locations, Defendant discussed issues with his contact in Atlanta, and Headrick indicated that he would be able to "hook up" the Defendant. On re-cross examination, Special Agent White testified that he was unaware of any testing performed on the methamphetamine found in Defendant's vehicle or the THP troopers' knowledge in identifying methamphetamine.

The Government then called THP Trooper Cothron, who testified that he had been a trooper with the THP since February of 2015, and had been assigned to the interdiction unit since June of 2016. Trooper Cothron stated that he was informed by his sergeant to be in the Crossville area at around 6:00 p.m. of February 26, 2016 to assist in a traffic stop of a blue Dodge Charger leaving from Atlanta. Trooper Cothron testified that he was informed that methamphetamine could potentially be inside of the vehicle, it was related to a Title III wiretap investigation, and that the vehicle was traveling northbound along I-75 into Tennessee. Trooper Cothron stated that he was informed that the vehicle had entered Highway 68 into Crossville, and he and his partner then maintained a stationary position on Highway 68.

Trooper Cothron testified that he then saw the Dodge Charger on Highway 68 traveling west to east towards Crossville, with tinted windows. Trooper Cothron stated that after catching up to the vehicle, he paced it driving 58 to 60 miles per hour in a 55 mile per hour zone. After

waiting until the vehicle traveled to a safe area, Trooper Cothron then pulled the vehicle over for speeding and a window tint violation.

Trooper Cothron stated that after he pulled the Dodge Charger over, he made contact with the driver of the vehicle by walking up to the front passenger window of the vehicle, where he saw a male driver and female passenger. Trooper Cothron testified that he provided the reasons for the stop, and asked the driver to exit the vehicle. After the driver left the vehicle, he provided a Tennessee driver's license which identified him as Jason Howard, while Trooper Cothron's partner spoke to the female passenger. Trooper Cothron asked Defendant where he had been traveling, to which Defendant responded that he had been shopping in Spring City, Tennessee with his girlfriend and daughter. Trooper Cothron testified that he previously had been told that the vehicle was leaving from Georgia, and that he found it odd that Defendant did not mention traveling from Georgia. Additionally, Trooper Cothron questioned Defendant regarding the window tint on his vehicle, to which Defendant responded that the tint had previously been checked at 32%. Trooper Cothron also asked Defendant where he had been shopping, as well as if there were any drugs present in the vehicle. Trooper Cothron testified that while questioning Defendant, he noticed that Defendant remained focused on the vehicle where Trooper Foster was talking to the female passenger, as opposed to making eye-contact. Moreover, Trooper Cothron stated Defendant's right jaw was tense and tight, as well as that he crossed his arms and turned towards Trooper Cothron, after being questioned if there were drugs in the car.

As a THP interdiction officer, Trooper Cothron testified that he interpreted Defendant's behavior to be odd when Defendant avoided eye-contact and focused on the vehicle. Further, based upon his training and experience, Trooper Cothron stated that Defendant appeared stressed after clenching his jaw. When asked if there were any drugs within the vehicle, Defendant stated

11

that there were not. Trooper Cothron then asked whether Defendant had previously been arrested, to which Defendant responded that he had been arrested for theft and attempted manufacturing of methamphetamine. Trooper Cothron testified that Defendant then stated, in response to his question, that he was a convicted felon due to this charge.

Trooper Cothron testified that at this time, due to Defendant's behavior—including his answer about where he was coming from, failure to make eye contact, crossed arms, and responses to questioning—led to a suspicion of illegal drugs within the vehicle, and he asked for consent to search the vehicle. After Defendant refused, Trooper Cothron requested that Trooper Foster employ his K-9 for an exterior search of the vehicle, and he witnessed the K-9 jump up and then sit in front of the front passenger window of the vehicle. Trooper Foster informed Trooper Cothron that he received a positive indication from the K-9.

Trooper Cothron testified that after Trooper Foster informed him that his K-9 had hit on the vehicle, they then searched the vehicle. At this point, Defendant, the female passenger, and his three-to-five-year-old female daughter were placed in Trooper Cothron's patrol vehicle. Trooper Cothron stated that while searching the vehicle, Trooper Foster pulled the carpet back next to the center console by the front passenger seat of the vehicle, and found a substance believed to be methampthetmaine in the center console. Further, Trooper Cothron testified that he noticed two drinks in a cupholder were slightly raised, and after removing a panel from the center console, found another bag containing what was believed to be methamphetamine below the arm rest. Trooper Cothron stated that the found methamphetamine was believed to be around two pounds based upon his estimation.

On cross examination, Trooper Cothron testified that on February 26, 2019, he did not speak directly with Special Agent White regarding the reasons for surveillance on Defendant's

vehicle, but that he was told by his sergeant that methamphetamine was believed to be in the vehicle. Additionally, Trooper Cothron stated that the vehicle was stopped around 6:55 p.m., and it was fairly dark at this time. Trooper Foster was in a separate vehicle, and Trooper Cothron testified that they both waited together for Defendant's vehicle. Further, Trooper Cothron stated that the K-9 is always present and assigned to Trooper Foster. Next, Trooper Cothron stated that after pulling over Defendant's vehicle, it was noted that Defendant might have a window tint violation. After talking to Defendant about the tint on the window, Trooper Cothron testified that a 35% tint is not legal in Tennessee, and thus Defendant's 32% tint was illegal. Trooper Cothron issued a citation for the tint in windows of Defendant's vehicle after the subsequent search.

Trooper Cothron clarified that the speed limit was 55 miles per hour in the area where Defendant was pulled over, and testified that he "paced" Defendant's vehicle by following an estimated "couple of car lengths back." Trooper Cothron stated that he pulled out behind Defendant's vehicle, followed for a short distance, noted the violation of speeding, and waited to pull over the vehicle until arriving at a safe location. Trooper Cothron testified that the traffic stop took place a short amount of time after following Defendant's vehicle, and estimated he pulled the vehicle over a few miles away from where he and Trooper Foster were originally parked. Trooper Cothron testified that his patrol vehicle, a 2014 Ford Explorer, has both a digital and analog speedometer, and that he has not had the speedometer calibrated since he began driving the vehicle in December of 2017.

Trooper Cothron stated that he estimated pacing Defendant's vehicle at 58 to 60 miles per hour, but that he was unsure of the accuracy of speedometers. After stopping Defendant's vehicle, he issued a citation for Defendant's window tint, as well as for traveling 58 miles per hour in a 55 mile per hour zone. Trooper Cothron detailed that he wrote the citations at the jail, and that if

13

there were no suspicion of illegal drugs, it would have taken less time to write the citation. Additionally, Trooper Cothron testified that after stopping Defendant's vehicle, Trooper Foster pulled in behind him and deployed his K-9 an estimated six to eight minutes after the traffic stop. Trooper Cothron stated that although Defendant did not make eye contact after stepping outside of the vehicle, he later learned that Defendant's young daughter was in the vehicle. In response to questioning, Trooper Cothron stated that it would be reasonable for Defendant to be concerned about his daughter during the traffic stop. Trooper Cothron also testified that he did not ask Defendant any further details regarding his drug conviction.

When discussing the use of Trooper Foster's K-9, Trooper Cothron testified that he was seated in his patrol car when Trooper Foster led the K-9 around Defendant's vehicle. Additionally, Trooper Cothron stated that Trooper Foster did not utilize a "jute tug" on the initial approach, and that he did not see Trooper Foster use any device to signal to the K-9 to indicate a positive alert. Trooper Cothron clarified Defendant did not provide his consent to search the vehicle, and at the time of the search, Defendant was in the backseat of Trooper Cothron's patrol vehicle, along with his daughter and girlfriend. During the search, a handgun was also found in the center console of the vehicle. Trooper Cothron testified that he found several plastic bags of items in the trunk of the vehicle, which Defendant stated he had bought from Goodwill.

On redirect examination, Trooper Cothron testified that his sergeant informed him that there was a federal investigation into the vehicle at issue traveling from Georgia. Therefore, Trooper Cothron stated that he interpreted Defendant's answer that he was shopping in Spring City, Tennessee to be suspicious because Defendant was attempting to dissociate himself from a trip to Georgia. Trooper Cothron clarified that the methamphetamine was found in the center console of the vehicle, as well as partially underneath the cupholder, and the firearm was found in

14

the center console closer to the backseat. Trooper Cothron stated that he watched the video of the traffic stop, and that he did not see Trooper Foster do anything strange to the K-9 before the K-9 indicated. Trooper Cothron detailed that when the K-9 was brought to the passenger side of the vehicle, the K-9 jumped into the open passenger window and immediately sat down, which he knew, based upon his experience, was the K-9 indicating the odor of drugs.

On re-cross examination, Trooper Cothron stated that Defendant's daughter was sitting in a booster seat in the back-right passenger side of Defendant's vehicle. Additionally, Trooper Cothron testified that the video of the traffic stop was made from his patrol vehicle, and that he was unsure of how long Defendant was driving from Atlanta before the traffic stop.

## III.     FACTUAL FINDINGS

The following factual findings are taken from the testimony at the suppression hearing, as well as Trooper Cothron's dashcam video recording made at the time of the stop:

In early 2019, TBI and HSI officials began to investigate a suspected drug trafficking organization, including obtaining a Title III wiretap on Headrick's phone. On February 26, 2019, TBI and HSI officials intercepted a call between Headrick and Defendant in which Headrick stated that he could "hook up" Defendant. TBI and HIS officials surveilled Headrick travelling to Atlanta, Georgia to meet with his alleged drug supplier. After a believed "money drop," TBI and HSI officials witnessed Headrick exchange a bag and head northbound on I-75, and intercepted a call between Headrick and Defendant arranging to meet at a gas station in Ringgold, Georgia, as well as Headrick stating that he needed gas money.

TBI and HSI officials continued to maintain surveillance on Headrick's vehicle, and witnessed Headrick drive into the arranged gas station. Headrick entered the gas station, returned to the pump, and began to pump gas into his vehicle. Defendant then drove into the gas station,

next to Headrick's vehicle, and Headrick and Defendant began to look inside the trunk of Defendant's vehicle. Headrick and Defendant subsequently exited the gas station and traveled northbound on I-75. TBI and HSI officials continued to surveil both vehicles, and law enforcement intercepted a call between Headrick and Defendant's girlfriend in which she discussed having an application on her phone to avoid law enforcement. TBI and HSI officers also intercepted a call between Headrick and a third-party, in which he stated that he had to make a delivery, and around Exit 62, Headrick and Defendant separated. TBI and HSI officers lost contact with both vehicles, continued to remain in contact with THP officials, and arranged for surveillance units to be stationed around Spring City, Tennessee. A surveillance vehicle noted that Defendant's Dodge Charger was located around Spring City, Tennessee, and TBI and HSI officers subsequently transferred surveillance of Defendant's vehicle to the THP. Trooper Cothron and Trooper Foster were located off of Highway 68 near Crossville and identified Defendant's Dodge Charger.

At approximately 18:54:47 on the video recording, Trooper Cothron notes on the radio that he paced the Dodge Charger as traveling at 58 miles per hour, and subsequently activated his blue lights at 18:57:57. While traveling on the two-lane Highway 68 towards Crossville, Trooper Cothron pulls over the vehicle over at approximately 18:58:09 on the video recording. Trooper Cothron then approaches the vehicle at the front passenger side window and notes that he stopped the car for speeding. At 18:58:55 on the video recording, Trooper Cothron asked Defendant to step outside of the vehicle, while Trooper Foster began to speak to the female passenger remaining in the vehicle at 18:59:28 on the video recording. Defendant refused to provide consent to search the vehicle at 19:02:04 on the video recording.

Trooper Cothron then notified Defendant that Trooper Foster is going to perform a K-9 search of the vehicle, and instructs the female passenger and child to exit the vehicle at 19:03:06

on the video recording. Trooper Foster begins his K-9 search of the vehicle at 19:04:28 on the video recording, and the K-9 alerts on the vehicle at 19:05:05 on the second time walking around the vehicle by jumping into the front passenger-side window and immediately sitting down. The K-9 alert occurred approximately seven minutes after the initial stop. Trooper Cothron and Trooper Foster then placed Defendant, his girlfriend, and his daughter into the patrol vehicle, and began to search the vehicle at 19:07:50 on the video recording. Ultimately, they found two bags of what was believed to be methamphetamine, as well as a firearm, during the search of the vehicle. Defendant and his girlfriend were subsequently placed under arrest.

## IV.    ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant challenges the warrantless search of his vehicle on February 26, 2019, claiming that law enforcement did not have a reasonable suspicion of criminal activity and did not have probable cause to stop and search his vehicle, as well as that the officers unconstitutionally deployed and directed a K-9 unit to "hit" on the Defendant's vehicle. [Doc. 13 at 3–4]. The Court examines each of these issues in turn.

### A.    Initial Traffic Stop

Defendant claims that Trooper Cothron lacked "probable cause to stop the vehicle." [Doc. 13 at 1]. A traffic stop qualifies as a "seizure" for purposes of the Fourth Amendment. *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). An officer may lawfully stop a car when there is probable cause to believe that a traffic violation has occurred or reasonable suspicion of an ongoing crime. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008); *see United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010) ("[T]here is nothing unreasonable about stopping a vehicle whose driver has just committed a

traffic violation.") (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).  However, the Sixth Circuit is clear that "[r]egardless of the officer's subjective motivations, a traffic stop is lawful if he has probable cause to believe a traffic violation occurred."  *United States v. Warfield*, 727 F. App'x 182, 185–86 (6th Cir. 2018) (citing *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008)).

The Court finds that the totality of the circumstances provided probable cause for Trooper Cothron to lawfully stop Defendant's vehicle for speeding.  Trooper Cothron testified that he pulled behind the Dodge Charger traveling east on Highway 68, and paced the vehicle as driving 58 to 60 miles per hour in a 55 mile per hour zone.  *See United States v. Garrido-Santana*, 360 F.3d 565, 572 (6th Cir. 2004) (noting the officer had probable cause to stop the defendant's vehicle for speeding in violation of Tennessee law); *United States v. Snoddy*, No. 4:18-CR-9, 2019 WL 2453683, at *2 (E.D. Tenn. Jan. 17, 2019) ("Trooper Malone observed Defendant exceeding the speed limit—which is uncontroverted—and performed a legal traffic stop."), *report and recommendation adopted by*, 2019 WL 1489063 (E.D. Tenn. Apr. 4, 2019).  Accordingly, the Court finds that Trooper Cothron had probable cause to stop Defendant's vehicle for speeding.

Additionally, the record supports a finding that Trooper Cothron had a reasonable suspicion that Defendant was engaged in criminal activity.  THP officials were in contact with TBI and HSI officers throughout February 26, 2019, and Trooper Cothron testified that his sergeant informed him that there was a federal investigation including a Title III wiretap involving the vehicle at issue, traveling northbound on I-75 from Atlanta, Georgia to Tennessee, and that there could potentially be methamphetamine inside of the vehicle.

The Sixth Circuit has adopted and applied the "collective knowledge rule," through which a court "impute[s] collective knowledge among multiple law enforcement agencies" and permits

"a responding officer [to execute] a stop at the request of an officer who possess the facts necessary to establish reasonable suspicion." *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012). Therefore, "the officers had at least reasonable suspicion before stopping the vehicle that one of its occupants had committed a felony and, further, might be in possession of contraband." *United States v. Dickens*, 748 F. App'x 31, 39 (6th Cir. 2018); *see Arizona v. Johnson*, 555 U.S. 323, 327 (2009) (indicating that "cause to believe any occupant of the vehicle is involved in criminal activity" satisfies "the first *Terry* condition . . . to detain an automobile and its occupants").

## B.     Scope and Duration of Traffic Stop

The Court next analyzes the scope and duration of the traffic stop, although Defendant does not assert any specific argument regarding a lack of reasonable suspicion to extend the stop.

"[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 18 (1968). Once a court determines that a seizure was proper, it must still assess "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. A traffic stop that is "based on probable cause and concededly lawful" can nevertheless "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). A seizure is reasonable under the *Terry* framework if the detention is "limited in [both] scope and duration." *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010) (brackets in original) (citing *Florida v. Royer,* 460 U.S. 491, 500 (1983)).

"Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir.

1999), *cert. denied*, 528 U.S. 1176 (2000). An investigating officer must use "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," and the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500.

The Sixth Circuit has held that there is no set length of time after which a traffic stop becomes per se unreasonable. *See Everett*, 601 F.3d at 493. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 687 (1985) (assessing the reasonableness of a *Terry* stop). The Supreme Court and the Sixth Circuit have specified what actions an officer may take without extending the duration of the traffic stop. "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). Officers may ask questions that are related or unrelated to the reason for the stop, as long as "any prolongation due to suspicionless unrelated questioning [was] reasonable." *Everett*, 601 F.3d at 494; *United States v. Hill*, 195 F.3d 258, 268–69 (6th Cir. 1999).

Ultimately, the Court finds that the scope of the investigatory detention during the traffic stop was reasonable, as Trooper Cothron questioned Defendant regarding his travel plans, past criminal history, obtained the vehicle registration and occupants' identification information, and then ran the criminal history of the occupants of the vehicle. Under *Rodriguez*, these activities are

all "ordinary inquiries incident to [the traffic] stop." 135 S.Ct. at 1615 (quoting *Caballes,* 543 U.S. at 408). "[C]ontext-framing questions," such as travel history and plans, "will rarely suggest a lack of diligence." *Everett*, 601 F.3d at 495. Further, Trooper Cothron's questions about the other passengers in the vehicle were permissible because they were "locomotion-related inquiries not strictly directed to the motorist's conduct at the time of the stop, such as '[the] motorist's travel history and travel plans' and 'the driver's authority to operate the vehicle . . . .'" *Id.* at 494 (quoting *United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001)). Generally, "[r]equesting a driver's license, registration, rental papers, running a computer check thereon, and issuing a citation are permissible police acts within the scope of the traffic stop." *United States v. Bonilla,* 357 F. App'x 693, 696 (6th Cir. 2009) (citing *United States v. Hill*, 195 F.3d 258, 269 (6th Cir. 1999)).

Moreover, the Court finds the scope of the initial traffic stop was reasonable due to the number of occupants in the vehicle. In *United States v. Torres-Ramos*, the Sixth Circuit stated that "[i]ssuing a speeding ticket does not require an officer to detain an individual in order to separately question a passenger regarding ownership or travel plans." 536 F.3d 542, 551 (6th Cir. 2008). However, unlike in *Torres-Ramos*, Trooper Cothron immediately asked Defendant to exit the vehicle, and thus, Trooper Cothron "had not completed his traffic stop when he requested [the driver to] exit the vehicle because [he] had not yet completed his actions in connection with the issuance or non-issuance of a citation . . . ." *United States v. Dixon*, 405 F. App'x 19, 22 (6th Cir. 2010). Additionally, while Trooper Cothron spoke to Defendant outside of his vehicle, Trooper Foster spoke to the passenger who remained in the vehicle.

As there is no specific time limit to determine the reasonableness of a traffic stop, "the proper inquiry is whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole*—including any prolongation due to suspicionless unrelated

questioning—was reasonable." *United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010) (quoting *United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008)). The Court finds that the traffic stop lasted approximately seven minutes—from the time Trooper Cothron pulled over the vehicle until the time the K-9 unit alerted on the vehicle. During this time, Trooper Cothron asked Defendant to exit the vehicle, questioned Defendant about his travel plans and criminal history, obtained the identification of Defendant and the other occupants of the vehicle, and radioed their information to run criminal history checks.

Ultimately, the facts and circumstances in the present case support the conclusion that the duration of the traffic stop was reasonable. *See, e.g.*, *United States v. Marsh,* 443 F. App'x 941, 943–44 (6th Cir. 2011) (holding that a traffic stop lasting fifteen minutes was not longer than necessary to complete the purpose of the stop); *United States v. Ellis*, 497 F.3d 606, 613–14 (6th Cir. 2007) (holding a stop that lasted thirteen minutes and thirty-nine seconds did not constitute a prolonged seizure).

### C.      Reasonable Suspicion of Criminal Activity

The Court also finds that Trooper Cothron's suspicions of criminal activity increased throughout the traffic stop to where he had a reasonable suspicion of criminal activity. "If an officer has a reasonable and articulable suspicion of criminal activity, he may extend the traffic stop long enough to confirm or dispel his suspicions." *United States v. Johnson*, 482 F. App'x 137, 143 (6th Cir. 2012). When evaluating whether a crime is afoot, law enforcement officers may draw upon their training and experience "to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (internal quotation omitted).

In considering whether reasonable suspicion exists, it is "well-established that an officer may conduct a stop based on information obtained by fellow officers." *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012) (internal citations omitted). "Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion." *Id.* at 766 (noting "[t]he collective knowledge doctrine applies equally to traffic stops and to vehicle searches").

Therefore, although Trooper Cothron did not listen to any of the wiretapped calls involving Defendant, he was aware of the ongoing investigation and suspected belief that Defendant's vehicle was transporting methamphetamine from Georgia into Tennessee. Special Agent White testified that TBI and HSI officers monitored intercepted calls between Headrick and Defendant, which they interpreted to be discussing drug trafficking due to their surveillance of Headrick, who they believed to be dealing large amounts of methamphetamine. Further, Special Agent White stated that in an intercepted call, Headrick stated that he could "hook up" Defendant, which he interpreted to mean an introduction to Headrick's provider of methamphetamine. Special Agent White also testified that he believed Defendant and Headrick's meeting in the gas station was suspicious, due to the intercepted call in which Headrick stated that he needed gas money, but he then proceeded to pump gas before Defendant arrived, as well as the proximity in time of the meeting to Headrick's meeting with his believed methamphetamine supplier.

Further, Trooper Cothron testified that during the traffic stop, while questioning Defendant, Defendant largely avoided eye-contact and focused on the vehicle where Trooper Foster was speaking to the female passenger. Trooper Cothron stated that Defendant's right jaw was tense and tight, as well as that he crossed his arms and made eye-contact after being questioned if there

23

were drugs in the car. While nervous behavior, standing alone, is insufficient to justify reasonable suspicion, it "is still relevant to the reasonable-suspicion calculus." *United States v. Pacheco*, 841 F.3d 384, 393 (6th Cir. 2016) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). In *Pacheco*, the Sixth Circuit held that nervousness is a permissible factor to consider when determining whether the officers had developed reasonable suspicion during a traffic stop. *Id.*; *see*, *e.g.*, *United States v. Branch*, 537 F.3d 582, 588–89 (6th Cir. 2008) (finding reasonable suspicion, in part, because the officers "observed increasing nervousness" as the traffic stop progressed).

Additionally, Trooper Cothron testified that his suspicion increased based upon the initial discrepancy between Defendant's travel plans, as Defendant stated that he had been shopping, and failed to mention traveling from Georgia. *See United States v. Jenkins*, 266 F. Supp. 3d 980, 987 (E.D. Mich. 2017) ("Similar to the facts in *Lyons*, when [the officer] stopped the F–150, he observed Defendant act uncooperative and nervous. He also was aware that Defendant was not being truthful when he claimed to have just left his father's home and when he stated he was a diabetic and showed [the officer] medications that were supposedly for his condition, yet the medications were not prescribed to him."). Trooper Cothron testified that due to Defendant's behavior, he suspected that there were illegal drugs within the vehicle, and asked for consent to search the vehicle.

Ultimately, officers are entitled "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu,* 534 U.S. 266, 273 (2002) (internal quotation omitted). "In considering the totality of the circumstances, 'we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *United States v.*

*Perez,* 440 F.3d 363, 371 (6th Cir. 2006) (quoting *United States v. Smith,* 263 F.3d 571, 588 (6th Cir. 2001) (additional citation omitted)).

The Court finds that the factors relied upon by Trooper Cothron established, in the aggregate, reasonable suspicion. First, Trooper Cothron had an initial suspicion that Defendant was transporting methamphetamine, due to the information he received from his sergeant regarding the TBI and HSI investigation into Headrick and Defendant. In conducting the traffic stop, Trooper Cothron therefore acted in reliance on the information received from other THP officers that had been in communication with federal law enforcement regarding the long-term investigation and related surveillance, in connection with his suspicion of reasonable criminal activity developed during the traffic stop. *See, e.g.*, *United States v. Adams*, No. 09-20224, 2010 WL 3504072, at *11 (E.D. Mich. Mar. 10, 2010) (finding state troopers "could defensibly act in reliance on the directions of the police dispatch and the DEA" where the troopers were notified by their dispatch of a vehicle description and license number of a vehicle that the DEA wished to stop for the purpose of seizing narcotics after learning in part through wiretaps that the defendant was transporting narcotics, and the DEA officer had probable cause to believe that the suspect's vehicle contained contraband), *report and recommendation adopted by*, 2010 WL 3504065 (E.D. Mich. Sept. 2, 2010).

Trooper Cothron further testified that several factors during the traffic stop, such as Defendant's jaw appearing tense and tight, failure to make eye-contact, and inconsistencies between previously-obtained information and Defendant's stated travels plans, led to his belief that there were potentially drugs in the vehicle. *See, e.g.*, *United States v. Bernal*, No. 5:17-102-DCR, 2017 WL 5629533, at *4 (E.D. Ky. Nov. 22, 2017) (finding reasonable suspicion from the defendants' behavior, as well as information previously received from a confidential informant, as

25

"[i]n other words, [the officer's] suspicion was properly heightened, not dispelled, during the questioning of the defendants"). "[E]ven a string of innocent behavior added together may amount to a reasonable suspicion of criminal activity." *United States v. Richardson*, 358 F.3d 625, 631 (6th Cir. 2004) (citing *United States v. Arvizu*, 534 U.S. 266, 273–75 (2002)).

Further, Trooper Cothron was permitted initially "to explain the reason for the stop." *United States v. Simpson*, 520 F.3d 531, 543 (6th Cir. 2008). "[A]n officer may ask unrelated questions to his heart's content, provided he does so during the supposedly dead time while he . . . is completing a task related to the traffic violation." *United States v. Everett*, 601 F.3d 484, 492 (6th Cir. 2010). Therefore, even though some of the questions Trooper Cothron asked were unrelated to the traffic stop, this line of questioning largely occurred while he was obtaining the information of the driver and passengers in the vehicle, his questions were also "calculated to investigate whether the Defendants were engaged in drug crimes," and he "acted diligently to either confirm or dispel his suspicions of illegal drug possession." *See United States v. Howard*, No. 3:18-CR-29-TAV-HBG, 2018 WL 6595364, at *15 (E.D. Tenn. Oct. 5, 2018), *report and recommendation adopted by*, 2018 WL 6061439 (E.D. Tenn. Nov. 20, 2018).

Accordingly, the Court finds that the detention was reasonable both in scope and duration because reasonable suspicion of other criminal activity arose during Trooper Cothron's initial questioning of the occupants of the vehicle. *See, e.g.*, *United States v. Torres-Ramos*, 536 F.3d 542, 553 (6th Cir. 2008) (finding reasonable suspicion existed in challenge to traffic stop based on both weak and strong factors such as inconsistent stories and an ongoing DEA wiretap of the vehicle's owner).

### D.    Use of Canine to Search Vehicle

Defendant asserts that "the improper direction of the K-9 officer to the 'drug dog' to 'hit' on [the] Defendant's automobile" violated his constitutional rights. [Doc. 13 at 4]. As the Court has already detailed, Trooper Foster led his K-9 around Defendant's vehicle, and following the alleged alert on the front passenger window of the vehicle, the officers had probable cause to search the vehicle. Defendant claims that the K-9 was improperly directed to alert on the vehicle. The Government responds that the traffic stop of Defendant's vehicle was "lawfully extended for further investigation, a trained drug dog alerted on the car . . . [and] the drug detection dog was not instructed or forced to alert on the car." [Doc. 24 at 6].

"[A]n alert by a properly trained narcotics dog while sniffing a vehicle is sufficient to establish probable cause for a search of the vehicle." *United States v. Patton*, 517 F. App'x 400, 402 (6th Cir. 2013). In *Florida v. Harris*, the Supreme Court reaffirmed the "totality-of-the-circumstances" approach to establish the reliability of a narcotics dog, stating:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*Florida v. Harris*, 568 U.S. 237, 246–47 (2013).

Plaintiff merely claims that the K-9 was improperly directed to indicate on his vehicle. However, Plaintiff fails to offer "any conflicting evidence" regarding the reliability of the K-9 unit, Anya. *Id.* The Government introduced as Exhibits 1 and 2 certifications for Trooper Foster and Anya from the United States Police Canine Association, as well as the "2017 Basic Narcotic Detector Handlers Training" through the Tennessee Department of Safety Training Center. Trooper Cothron testified that he did not witness Trooper Foster utilize a "jute tug" on the initial

approach, and that he did not see Trooper Foster use any device to signal to the K-9 to indicate a positive alert. Suppression hearings involving a K-9 alert should not become "mini-trial[s] . . . on a drug dog's training and performance." *United States v. Robinson*, 390 F.3d 853, 875 (6th Cir. 2004). Therefore, "[b]ecause training records established [the K-9's] reliability in detecting drugs and [Defendant] failed to undermine that showing," probable cause existed to search Defendant's vehicle. *Harris*, 568 U.S. at 250.

Defendant also asserts that the K-9 was directed to "hit" on the vehicle "despite the fact that no drugs were ever located in the vehicle." [Doc. 13 at 2]. However, Trooper Cothron testified that an estimated two pounds of what was believed to be methamphetamine, as well as a firearm, was found in the vehicle near the center console. Further, in *Harris*, the Supreme Court held that probable cause may be found to search a vehicle, supported by a well-trained canine alert, even when drugs are not found, as such an alert "would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." 568 U.S. at 248.

Lastly, the Court finds that Trooper Cothron did not unconstitutionally prolong the traffic stop for the purpose of waiting for Trooper Foster to arrive and conduct a canine sniff. In *Rodriguez v. United States*, the Supreme Court held that, absent reasonable suspicion, a law enforcement officer violates the Fourth Amendment if a traffic stop is prolonged—even for as little as seven to eight minutes—solely to conduct a dog sniff. 135 S. Ct. 1609, 1612–13 (2015) (holding "[t]he critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—*i.e.,* adds time to—'the stop'"). "If a dog sniff is conducted while someone is otherwise properly seized, such as in a lawful traffic stop, the dog sniff may render an otherwise lawful seizure unlawful only if it unreasonably

prolongs the initial stop and the officer lacked an independent reasonable suspicion to extend the stop." *United States v. Stepp*, 680 F.3d 651, 663 (6th Cir. 2012) (internal citations omitted).

As the Court has already reviewed, Trooper Foster was parked next to Trooper Cothron waiting for Defendant's vehicle, and arrived to the traffic stop shortly after Trooper Cothron stopped the vehicle. Trooper Foster had his K-9 unit present in the car before the stop, and began to question the passenger in the vehicle while Trooper Cothron spoke to Defendant. Ultimately, the duration of this stop—measured from the time Defendant's vehicle stopped to when the K-9 alerted on the vehicle—was approximately seven minutes. Therefore, the Court finds that the traffic stop had not surpassed the time in which the "tasks tied to the traffic infraction [were]-or reasonable should have been-completed," and further, the Court has already determined that Trooper Cothron had a reasonable suspicion of criminal activity to prolong the stop. *Rodriguez*, 135 S. Ct. at 1615.

In *Rodriguez*, the dog sniff occurred roughly eight minutes after the police officer issued a written citation to Rodriguez, and the stop was prolonged so that the police could conduct a dog sniff around his vehicle. 135 S. Ct. at 1613. "[U]nlike in *Rodriguez* where the officers extended the traffic stop—without any individualized suspicion—after all tasks tied to the traffic infraction had been completed and refused to allow Rodriguez to leave, 135 S.Ct. at 1613–14, 1616, the stop in this case was neither completed nor unreasonably prolonged." *See United States v. Baxter*, No. 4:17-cr-42-TRM-SKL, 2019 WL 1598950, at *8 (E.D. Tenn. Mar. 13, 2018), *report and recommendation adopted by*, 2018 WL 1594778 (E.D. Tenn. Apr. 2, 2018). Ultimately, "the troopers diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, and the length of time and intrusiveness of the stop as a whole . . . were reasonable related to the officers' reasonable articulable suspicion of drug activity." *United States v. Samuels*, 443

F. App'x 156, 163 (6th Cir. 2011); *see, e.g.*, *United States v. Coker*, 648 F. App'x 541, 546 (6th Cir. 2016) (treating a 39-minute stop "involving reasonable suspicion and a drug dog" as inarguably reasonable); *United States v. Zuniga*, 613 F. App'x 501, 505 (6th Cir. 2015) (affirming denial of dog-related motion to suppress when the "total length of the traffic stop was thirty minutes").

## V.    CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds that no Fourth Amendment violation occurred in this case because the troopers had reasonable suspicion to detain Defendant, and that the seven-minute detention of Defendant during the traffic stop was reasonable in both scope and duration.   Further, Defendant has failed to challenge the reliability of the K-9 unit.   Accordingly, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress [**Doc. 13**] be **DENIED**.[1]

Respectfully submitted,

*Bruce Guyton*

United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).