# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CASE NO. 3:19-CR-83 |
| ) | Chief Judge Reeves |
| JASON L. HOWARD, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

The Honorable H. Bruce Guyton, United States Magistrate Judge, filed a 30-page Report and Recommendation [R. 31], in which he recommended that Defendant's Motion to Suppress and Memorandum in Support [R. 13] be denied.

This matter is before the Court for consideration of Defendant's objections [R. 33] to the Report and Recommendation. As required by 28 U.S.C. § 36(b)(1) and Fed. R. Civ. P., 72(b), the Court has now undertaken a *de novo* review of those portions of the Report and Recommendation to which Defendant objects. For the reasons that follow, the Court finds Defendant's objections without merit and the objections will be overruled.

The parties do not object to Judge Guyton's factual determinations, and the court concludes they are accurate. Judge Guyton's factual findings, taken from the testimony at the suppression hearing and Trooper Cothron's dashcam video recording made at the time of the stop, reflect the following: In early 2019, officials from both the Tennessee Bureau of Investigation ("TBI) and Homeland Security Investigations ("HSI") began to investigate a suspected drug trafficking organization, including obtaining a Title III wiretap on Roy Headrick's phone, a suspected drug trafficker. On February 26, 2019, TBI and HSI officials intercepted a call between Headrick and

1

Defendant in which Headrick stated that he could "hook up" Defendant. TBI and HSI officials surveilled Headrick traveling to Atlanta, Georgia, to meet with his alleged drug supplier. After a believed "money drop," TBI and HSI officials witnessed Headrick exchange a bag and head northbound on I-75. During that time, the officials intercepted a call between Headrick and Defendant arranging to meet at a gas station in Ringgold, Georgia. Additionally, during that phone call, Headrick stated that he needed "gas money."

TBI and HSI officers continued to maintain surveillance on Headrick's vehicle and witnessed Headrick drive into the arranged gas station. Headrick entered the gas station, returned to the pump, and began to pump gas into his vehicle. Defendant then drove into the gas station, next to Headrick's vehicle, and Headrick and Defendant began to look inside the trunk of Defendant's vehicle. Headrick and Defendant subsequently exited the gas station and traveled northbound on I-75. TBI and HSI officers continued to surveil both vehicles, and law enforcement intercepted a call between Headrick and Defendant's girlfriend in which she discussed having an application on her phone to avoid law enforcement.

TBI and HSI officers also intercepted a call between Headrick and a third-party, in which Headrick stated that he had to make a delivery. Headrick and Defendant subsequently separated. TBI and HSI officers then lost contact with both vehicles. Those officers contacted officials with the Tennessee Highway Patrol ("THP") and arranged for surveillance units to be stationed around Spring City, Tennessee. A surveillance vehicle noted that Defendant's Dodge Charger was located around Spring City, Tennessee, and TBI and HSI officers subsequently transferred surveillance of Defendant's vehicle to the THP. Trooper Cothron and Trooper Foster were located off Highway 68 near Crossville and identified Defendant's Dodge Charger.

At approximately 18:54:47 on the video recording, Trooper Cothron notes on the radio that he paced the Dodge Charger as traveling at 58 miles per hour, and subsequently activated his blue lights at 18:57:57. While traveling on a two-lane highway towards Crossville, Trooper Cothron pulls over the vehicle at approximately 18:58:09 on the video recording. Trooper Cothron then approaches the vehicle at the front passenger side window and notes that he stopped the car for speeding. At 18:58:55 on the video recording, Trooper Cothron asked Defendant to step outside of the vehicle. At 18:59:28 on the video recording, Trooper Foster began to speak to the female passenger, Defendant's girlfriend, while she sat in Defendant's vehicle. Defendant refused to provide consent to search the vehicle at 19:02:04 on the video recording.

Trooper Cothron then notifies Defendant that Trooper Foster is going to perform a K-9 search of the vehicle and instructs Defendant's girlfriend and child to exit the vehicle at 19:03:06 on the video recording. Trooper Foster begins his K-9 search of the vehicle at 19:04:28 on the video recording, and the K-9 alerts on the vehicle at 19:05:05 on the second time walking around the vehicle by jumping into the front passenger-side window and immediately sitting down. The K-9 alert occurred approximately seven minutes after the initial stop. Trooper Cothron and Trooper Foster then placed Defendant, his girlfriend, and his daughter into the patrol vehicle, and began to search the vehicle at 19:07:50 on the video recording. Ultimately, the troopers found two bags of what was believed to be methamphetamine, as well as a firearm, during the search of the vehicle. Defendant and his girlfriend were subsequently placed under arrest.

Defendant filed three objections to the R&R as follows:

1.  Although he does not cite to any case law in his objection, Defendant avers that Judge Guyton erred in concluding that the initial traffic stop was justified based on the totality of the circumstances. Defendant argues that there was no support in the record for a finding that,

under the theory of 'collective knowledge,' Trooper Cothron had reasonable suspicion that Defendant was engaged in criminal activity. Defendant specifically argues the federal agents, who observed Defendant at the gas station, did not provide testimony to support a conclusion that Defendant was engaged in criminal activity as opposed to Headrick, the original target of the investigation.

Defendant's basis for this objection is incorrect for two reasons. First, to conduct an initial traffic stop, an officer does not need to have a reasonable suspicion of an ongoing crime. A lawful stop can occur if the officer has probable cause to believe that a traffic violation has occurred. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). Trooper Cothron paced Defendant's car going above the speed limit. Therefore, Trooper Cothron had probable cause to believe that a traffic violation occurred and could conduct a stop regardless of his reasonable suspicion of an ongoing crime. Moreover, if a traffic stop is supported by probable cause, the subjective intent of the officer conducting the stop is irrelevant. *Id.* (citing to *Whren v. United States,* 517 U.S. 806, 813 (1996)). The Sixth Circuit has held that "police officers [may] stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir. 1995); *see also United States v. Hill*, 195 F.3d 258, 265 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000) (upholding stop supported by probable cause when officer initially followed vehicle because it was of a type used to transport narcotics).

Second, Trooper Cothron did have reasonable suspicion that Defendant was engaged in criminal activity. The Sixth Circuit has adopted and applied the "collective knowledge rule," through which a court "impute[s] collective knowledge among multiple law enforcement agencies" and permits "a responding officer [to execute] a stop at the request of an officer who

4

possess the facts necessary to establish reasonable suspicion." *Lyons*, 687 F.3d at 766. Reasonable suspicion requires:

> more than a mere hunch but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a Terry stop.

*Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (quoting *Smoak v. Hall*, 460 F.3d 768, 778–79 (6th Cir.2006)).

The conduct monitored by officers and investigators satisfies the reasonable suspicion requirement. THP officials were in contact with TBI and HSI officials throughout February 26, 2019, about Defendant's activities. Trooper Cothron testified that his sergeant informed him that there was a federal investigation including a Title III wiretap involving the vehicle at issue, traveling northbound on I-75 from Georgia to Tennessee, and that there could potentially be methamphetamine inside of the vehicle. Therefore, the record supports a finding that Trooper Cothron had a reasonable suspicion that Defendant was engaged in criminal activity.

Throughout the day investigators heard and witnessed several suspicious activities, and the knowledge of those activities is imputed to Trooper Cothron because of the collective knowledge rule. After Hedrick allegedly met his supplier of methamphetamine for a believed "money drop", TBI and HSI officers then witnessed Headrick exchange a bag, leave that location, and head in the direction of Defendant. Special Agent White testified that during this period, the investigation intercepted a phone call between Headrick and Defendant. In that conversation, Headrick stated that he needed gas money and planned with Defendant to meet at a gas station in Ringgold, Georgia. Special Agent White stated that the investigation believed Defendant's contact with Headrick was suspicious because immediately following Headrick's meeting with his alleged drug

5

supplier, he communicated with Defendant regarding their locations, Defendant discussed issues with his contact in Atlanta, and Headrick indicated that he would be able to "hook up" the Defendant. Further, when reviewing this conversation, Special Agent White clarified that based upon the surveillance of Headrick, he believed that Headrick's statement to Defendant that he could "hook [Defendant] up," meant that he could "hook up" Defendant with Headrick's drug supplier in Atlanta.

Moreover, law enforcement witnessed Headrick drive into the gas station and begin pumping gas for his vehicle. Special Agent White stated that he then witnessed the Defendant drive next to Headrick's vehicle, and Headrick and Defendant greeted each other and began to look inside the trunk of Defendant's vehicle. Special Agent White testified that he was suspicious because Defendant and Headrick had previously spoken about Headrick's need for gas money, but Headrick had already pumped gas before Defendant arrived. Special Agent White testified that no TBI and HSI officers witnessed Headrick and Defendant conduct an exchange at the gas station. The viewpoint of the surveillance units was at least partially obstructed because Defendant's and Headrick's backs faced the surveillance unit when standing in front of the open trunk of Defendant's vehicle. Headrick and Defendant then left in different intervals from the gas station, but reconnected on the interstate, as they stayed on I-75, traveling northbound towards Knoxville.

TBI and HSI officers continued surveillance, and Special Agent White stated that both Headrick and Defendant were driving at a high rate of speed, between 90 to 100 miles per hour. Additionally, Special Agent White testified that TBI and HSI officers intercepted a conversation between Headrick and Defendant's girlfriend, who was present in Defendant's car, in which Defendant's girlfriend stated that she had an application on her phone to avoid law enforcement detection. Special Agent White detailed that the vehicles continued driving northbound on I-75

until Exit 62, and TBI and HSI officers intercepted a phone call between Headrick and the Defendant, in which Headrick stated that he was going to deliver something in someone's mailbox.

After this phone call, law enforcement lost contact with Defendant and Headrick. Special Agent White testified that he informed THP of the circumstances of this investigation and that he wished for the THP to stop the vehicle if they observed separate reasonable suspicion of criminal activity and probable cause to search the vehicle. Trooper Cothron testified that he then saw the Dodge Charger on Highway 68 traveling west to east towards Crossville, with tinted windows. Trooper Cothron stated that after catching up to the vehicle, he paced it driving 58 to 60 miles per hour in a 55 mile per hour zone. Trooper Cothron then pulled the vehicle over for speeding and a window tint violation.

Upon pulling Defendant over and speaking with him outside of vehicle, Defendant exhibited some signs of suspicious behavior. Trooper Cothron asked Defendant where he had been traveling, to which Defendant responded that he had been shopping in Spring City, Tennessee, with his girlfriend and daughter. Trooper Cothron testified that he previously had been told that the vehicle was leaving from Georgia, and that he found it suspicious that Defendant did not mention traveling from Georgia. Trooper Cothron testified that while questioning Defendant, he noticed that Defendant remained focused on the vehicle where Trooper Foster was talking to the female passenger, as opposed to making eye-contact. Moreover, Trooper Cothron stated Defendant's right jaw was tense and tight, as well as that he crossed his arms and turned towards Trooper Cothron, after being questioned if there were drugs in the car. As a THP interdiction officer, Trooper Cothron testified that he interpreted Defendant's behavior to be odd when Defendant avoided eye-contact and focused on the vehicle. Further, based upon his training and experience, Trooper Cothron stated that Defendant appeared stressed after clenching his jaw.

7

Given the above detailed conduct and conversations of Defendant, this Court finds that there is support in the record for ruling that, under the theory of 'collective knowledge,' Trooper Cothron had reasonable suspicion that Defendant was engaged in criminal activity. Defendant's conversations with a suspected drug dealer, the timing of those conversations, and the subsequent meeting are all suspicious given the circumstances. Defendant's behavior during the traffic stop and his failure to mention his travel to Georgia are also suspicious. Defendant's conduct, which is all imputed to Trooper Cothron based on the collective knowledge theory, establishes a reasonable suspicion of Defendant. Thus, Judge Guyton did not err in concluding that the initial traffic stop was justified based on the totality of the circumstances.

2. Defendant also argues that Judge Guyton was incorrect in concluding that the scope and duration of the traffic stop conducted by Trooper Cothron was permissible. Defendant specifically argues that "[t]he length of the stop far exceeded the time necessary to write up a citation to your Defendant for speeding, making the detention constitutionally impermissible."

The Sixth Circuit has held that there is no set length of time after which a traffic stop becomes per se unreasonable. *See United States v. Everett*, 601 F.3d 484, 493 (6th Cir. 2010). Because there is not a specific number of minutes that determines whether a stop is reasonable, "the proper inquiry is whether the 'totality of the circumstances surrounding the stop' indicates that the duration of the stop as a whole—including any prolongation due to suspicionless unrelated questioning—was reasonable." *Id*. at 494 (quoting *United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008)).

From the time Trooper Cothron pulled over Defendant's vehicle until the time the K-9 unit alerted on the vehicle, approximately seven minutes elapsed. During these seven minutes, Defendant exited the vehicle, Trooper Cothron questioned Defendant about his criminal history

and his travel plans, obtained the identification of Defendant and his girlfriend, and radioed their information to run criminal history checks. Per *Rodriguez v. United States*, Trooper Cothron's questions were all ordinary in the course of a traffic stop. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (citing to *Illinois v. Caballes*, 543 U.S. 405, 408 (2005). Further, "context-framing questions," such as travel history and plans, "will rarely suggest a lack of diligence." *Everett*, 601 F.3d at 495. Moreover, obtaining identification of the occupants of the vehicle and radioing that information to check their criminal backgrounds was reasonable given the circumstances.

Ultimately, this Court finds that the facts and circumstances in this case support the conclusion that the duration of the traffic stop was reasonable.

3. Defendant's final objection is that Judge Guyton erred in concluding that there was reasonable suspicion of criminal activity during the traffic stop that justified an extended traffic stop and ultimately led to the discovery of illegal drugs and a weapon.

"If an officer has a reasonable and articulable suspicion of criminal activity, he may extend the traffic stop long enough to confirm or dispel his suspicions." *United States v. Johnson*, 482 F. App'x 137, 143 (6th Cir. 2012). And when evaluating whether such reasonable suspicion exists, it is "well-established that an officer may conduct a stop based on information obtained by fellow officers." *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012) (internal citations omitted). "Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion." *Id.* at 766.

Therefore, although Trooper Cothron did not participate in the HSI and TBI's prior investigation of Defendant, he was aware of the ongoing investigation and the resulting suspected

9

belief that Defendant's vehicle was transporting drugs into Tennessee. The HSI and TBI suspected Defendant of such activity because of the following suspicious activity: the monitored intercepted calls between Headrick and Defendant, which the investigators interpreted to be discussing drug trafficking due to their surveillance of Headrick; the subsequent meeting at a gas station in Georgia, at which Headrick proceeded to pump gas before Defendant arrived even though Headrick had previously stated he needed gas money; and the proximity in time of the meeting at the gas station to Headrick's meeting with his believed methamphetamine supplier.

Additionally, Trooper Cothron testified that his suspicion was raised during the traffic stop because, while questioning Defendant, Defendant avoided making eye-contact with him. Moreover, Defendant focused on the vehicle where Trooper Foster was speaking to Defendant's girlfriend. Trooper Cothron also stated that Defendant's right jaw was tense and that he crossed his arms and made eye-contact after being questioned if he had drugs in the car. Although nervous behavior, by itself, is insufficient to justify reasonable suspicion, nervousness "is still relevant to the reasonable-suspicion calculus." *United States v. Pacheco*, 841 F.3d 384, 393 (6th Cir. 2016) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)); *see also United States v. Branch*, 537 F.3d 582, 588–89 (6th Cir. 2008) (finding reasonable suspicion, in part, because the suspect displayed "increasing nervousness" during the traffic stop). And when an officer is evaluating whether a crime is happening, the officer may draw upon his experience and training "to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (internal quotation omitted).

Defendant points out that Trooper Cothron acknowledged that the presence of Defendant's young daughter in the vehicle created circumstances in which it would be "reasonable for

[Defendant] to be concerned" about his daughter during the stop. Defendant also highlights Trooper Cothron's acknowledgement that people who are pulled over by police are typically not happy about the stop and may have body posture that indicates as such. Defendant makes these points to argue that there was a legitimate, nonsuspicious reason for his nervous behavior, and therefore, Trooper Cothron did not have the requisite suspicion that criminal activity was occurring needed to extend the traffic stop. Regardless of whether there was good cause for this behavior, Defendant does not argue he did not display it. Further, this does not nullify Trooper Cothron's testimony that Defendant's behavior was odd and was indicative of someone who was acting suspicious. Additionally, Trooper Cothron testified that his suspicion increased due to Defendant's statement that he had been shopping in Spring City, Tennessee, and his failure to mention any travel to Georgia. Trooper Cothron stated that he interpreted Defendant's statement to be suspicious because Defendant was attempting to dissociate himself from a trip to Georgia.

Ultimately, "[i]n considering the totality of the circumstances, 'we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (additional citation omitted)). The Court finds that, in the aggregate, the factors relied upon by Trooper Cothron established reasonable suspicion. First, due to the information he received from his superiors that had communicated with investigators from the TBI and HSI about the long-term investigation and related surveillance, Trooper Cothron had an initial suspicion that Defendant was transporting methamphetamine. In conducting the traffic stop, Trooper Cothron acted in reliance on that information, as well as his personal suspicion of criminal activity that he developed during the traffic stop. *See United States v. Adams*, No. 09-20224, 2010 WL 3504072,

at *11 (E.D. Mich. Mar. 10, 2010) (finding state troopers "could defensibly act in reliance on the directions of the police dispatch and the DEA" where the troopers were notified by their dispatch of a vehicle description and license number of a vehicle that the DEA wished to stop for the purpose of seizing narcotics after learning in part through wiretaps that the defendant was transporting narcotics, and the DEA officer had probable cause to believe that the suspect's vehicle contained contraband), *report and recommendation adopted by*, 2010 WL 3504065 (E.D. Mich. Sept. 2, 2010).

Second, during the traffic stop, Trooper Cothron believed Defendant might have drugs in his vehicle due to Defendant's failure to make eye contact, his focus on his own vehicle while being questioned, his jaw appearing tense and tight, as well as his failure to mention any travel to Georgia. *See, e.g.*, *United States v. Bernal*, No. 5:17-102- DCR, 2017 WL 5629533, at *4 (E.D. Ky. Nov. 22, 2017) (finding reasonable suspicion from the defendants' behavior, as well as information previously received from a confidential informant, as "[i]n other words, [the officers'] suspicion was properly heightened, not dispelled, during the questioning of the defendants"); *United States v. Richardson*, 358 F.3d 625, 631 (6th Cir. 2004) (citing *United States v. Arvizu*, 534 U.S. 266, 273–75 (2002)) ("[E]ven a string of innocent behavior added together may amount to a reasonable suspicion of criminal activity.").

As such, the Court finds that the detention was reasonable both in scope and duration because reasonable suspicion of criminal activity arose during Trooper Cothron's questioning of the occupants of the vehicle. *See United States v. Torres-Ramos*, 536 F.3d 542, 553 (6th Cir. 2008) (finding reasonable suspicion existed during traffic stop based on several factors including inconsistent stories and an ongoing DEA wiretap of the vehicle's owner).

Within this third objection, Defendant also argues that during the traffic stop Trooper Cothron questioned Defendant about his prior drug convictions to unreasonably extend the time of the traffic stop and allow the K9 unit time to search the vehicle. An officer can ask unrelated questions so long as he does so during the 'dead time' while he is completing a task related to the traffic violation. *Everett*, 601 F.3d at 492. Trooper Cothron largely asked questions while he was obtaining the information of Defendant and his girlfriend, which is related to the traffic violation at hand. Also, Trooper Cothron's questions were "calculated to investigate whether the Defendants were engaged in drug crimes," and he "acted diligently to either confirm or dispel his suspicions of illegal drug possession." *See United States v. Howard*, No. 3:18-CR-29-TAV-HBG, 2018 WL 6595364, at *15 (E.D. Tenn. Oct. 5, 2018), *report and recommendation adopted by*, 2018 WL 6061439 (E.D. Tenn. Nov. 20, 2018). Therefore, Trooper Cothron's questions were reasonable in the context of the circumstances here. *Everett*, 601 F.3d at 493 ("[T]he touchstone of any Fourth Amendment analysis is reasonableness, we must conduct a fact-bound, context-dependent inquiry in each case."

After a careful review of the record, the court is in complete agreement with Judge Guyton's recommendation that Defendant's motion to suppress be denied. Accordingly, the court **ACCEPTS IN WHOLE** the Report and Recommendation under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). It is **ORDERED**, for the reasons stated in the Report and Recommendation, which the court adopts and incorporates into its ruling, that Defendant's motion to suppress [R. 13] is **DENIED.**

_____
**CHIEF UNITED STATES DISTRICT JUDGE**